Case number 16-7125, Jill Marcin v. Reliance Standard Life Insurance Company and Elk Appellants. Mr. Baccarat for the appellants, Mr. Elkin for the athlete. Mr. Baccarat for the appellants, Mr. Elkin for the athlete. Good morning. May it please the Court. Joshua Baccarat. I represent the defendant's appellants in this case. I'd like to reserve two minutes of time for rebuttal. This appeal is from a disability benefit claim under the ERISA statute. And the claim in this case grants discretionary authority to the plan, Reliance, to make eligibility determinations. So the standard of review in this case is the deferential arbitrary versus standard. Under that standard, as long as the decision is a reasonable one, it must be upheld. And in this case, the district court concluded that it would be reasonable for Reliance to conclude that the records do not prove that Ms. Marcin was disabled at the time she stopped working. The court also twice said in its opinion that it was not making a judicial determination that she proved that she was eligible for benefits. Therefore, there's no legal basis for the district court to have awarded benefits in this case. That's clear. This court, in Heller v. Fortis Benefits, 142 F. 3rd 487, stated that it is the claimant's burden to prove eligibility for benefits. And that's the same even in a non-ERISA case. It is always the claimant's burden to prove that they are eligible. And here, it's a higher burden because they have to show that a decision against that was arbitrary and capricious. So how did the district court arrive at this decision? The court in this case said that it was justified in entering judgment for Ms. Marcin because the only decision made by Reliance was that she did not prove or that Reliance said that she was capable of full-time employment. And that was not reasonably supported. But that's wrong. That flips the burden of proof on its head. And more important, the district court was wrong because Reliance specifically said she failed to meet her burden. While it did say that she was capable of full-time work, on page 2415 of the joint appendix, it also stated, quote, or that she, quote, failed to show that her impairments prevented her from performing all the material duties of a regular occupation on a full-time basis, end quote. So the basis for the district court's conclusion is wrong, and that sentence So if we agree with you that the findings so far, that this requires reversal, on remand, can the district court then conclude that she is disabled and order payment of benefits? Well, that's a two-part question, Your Honor. The first part is that this court refused to know the district court's decision. So can we do that? You can do that. That's the point. So we can make that judgment? You can make that judgment. That she's disabled? Well, you could, but you can't based on this evidence. We could, but we can't? You cannot, Your Honor. And that's why, if you look at what the district court found, and the evidence in this case, there's a reason why the district court didn't find in her favor. The evidence doesn't come close to supporting that. The district court said, well, let's get to the eligibility. She has to be totally disabled for 180 consecutive days. That's the elimination period. And that disability must start before her coverage ended. Her coverage ended March 1, 2008. And what the district court said in its first decision in this case was that her own doctor said she could return to work in November 2007. Her own doctor, she only complained of some mild fatigue when she stopped working. She didn't stop working pursuant to any doctor's instructions. And, in fact, she didn't even see a doctor until 10 days after she stopped working. And, Judge Ballard, I know you gave me a look, and I know where you're heading, so I'm going to address that. So that 10 days after she stopped working, she did complain of extreme fatigue at that point. But she said that her condition had improved. So if it had improved, her prior visit was in December of 2007, and she said that she had mild fatigue. And as the district court said in its first decision, mild fatigue really isn't disabling condition. We also have the fact that her own doctor said that she was disabled as of March 20, 2008. That's 20 days after her coverage ended. And then let's add this. So Ms. Marson herself, what did she argue to the district court? She realized the evidence didn't support her claim during the relevant time. She argued that she became disabled in April 2008. She tried to argue that the elimination period should have lasted longer even though she stopped working in February of 2008. And the district court correctly said no. Your disability starts before March 1, 2008, and the evidence just does not support it. So what we have here is the record in this case just cannot support the disability claim. And the district court tried to give her every opportunity she could to prove it. The district court remanded it several times. Was she partially disabled during the elimination period? No. That issue was fully addressed. That was one of the bases for the remand. And what Reliance asked a few of the doctors to, or independent doctors, to look at the evidence to say was she disabled either cognitively, psychiatrically, or physically. And Dr. Deans and Shipko separately concluded that impairment was not supported based on these mild fatigue complaints. Even partial? Not even partially. They found no impairment supported. And that's important because in this court's decision in Petaway versus Teachers Insurance, this court said that it is not arbitrary and capricious to rely on an independent report like those of Dr. Deans and Shipko. So if it's not unreasonable, then it can't be arbitrary and capricious. And there's even more comments by the district court. The district court in this case also said that in its first decision, before it remanded it, it said there's little evidence that Ms. Marston was disabled. And the court also said that she did little to prove her disability claim. Now, fast forward. She submitted additional evidence. The court went through all that evidence and said it doesn't support the claim either because most of that evidence relates to the time after her coverage ended. And then she submitted these general articles. And the court said that doesn't prove she's disabled. So the court said in its second decision, the one that's before this court now, that the record is the same now as it was then. And the record then was there was little evidence supporting her claim, according to the district court. And the evidence in this case also is that she said, the district court said, that it would be reasonable to conclude that she did not support her disability claim. That means it cannot be arbitrary and capricious. And you have to look at the language in the ERISA statute. 29 U.S.C. 1132a1b, that's the section they rely on for benefits. And what's it say? That a court can award benefits due under the terms of the plan. Well, this court made no, not this court, that court made no determination that any benefits were due under the terms of the plan. It made a wrong conclusion that we never said that she failed to meet her burden. So, Your Honor, I do not believe that this has to be remanded. The district court already made the finding of reasonableness and said that she did not meet her burden. Twice the court said it was not finding that this ruling in her favor means that she met her burden. So what we're asking the court to do is to reverse the judgment of the district court and enter judgment in favor of Reliance and the plan. I just think it's a very strange plan, to have a plan that defines partial disability as total disability. And you have a situation in which the doctor said she can return to work, but if she could return to work only on a limited or part-time basis, that doesn't show that she's non-disabled. And your recitation suggested that it shows that. And I take your point that it's her burden, there has to be evidence of at least partial disability, but the policy is part of the problem here. Well, it says during the elimination period, partial disability will be considered. So, yes, it does, a partial disability. And the reason being is they offer different types of policies, and so that language appears throughout. But some of them, a partial disability does not qualify. This one it does. But the district court even said this. The district court in its first decision said, but what other than the fact that she stopped working meant that she was disabled? And the court even said the same about the fact that she did return only part-time. What does that mean as far as her being even partially disabled? It doesn't prove it. There's no doctor's opinion supporting the claim during this relevant time period. That's the problem here. She failed to sustain her burden of proving. Now, we did say, we made it clear, she's partially disabled, she's eligible. But the doctors, her own doctors didn't support that claim during the relevant time period, and the independent experts who were reasonably relied on, that's what the district court said, we reasonably relied on it, they said she did not support impairment from full-time work. Setting aside all that, could you just answer Judge Pillard's question? Why, I puzzled over this too, why does a, I'm looking at the residual disability clause here, if you're partially disabled during the elimination period, in other words, then you're totally disabled. What, how does that, am I reading that correctly? You are, Your Honor. And again, it's because there are some policies that say if you are partially disabled, you are not totally disabled. You have to be totally disabled from each and every duty of your occupation to satisfy the elimination period. This policy does not. So if you are partially disabled during the elimination period, you're totally disabled. That is correct, Your Honor. And if you're provisionally disabled, you're totally disabled. If you're partially? Isn't there two things? Residually, right. Residual disability equals partial disability. Which equals totally disabled. I did not draft this. I was going to ask you that. Who drafts this stuff? Well, a lot of times they're limited by state insurance departments, and they require specific language. Then you scratch your heads and say. I did a lot of head scratching on this one. I mean, this is not unusual. Right. But the bottom line is that they did see that she was partially disabled, and they concluded based on all the evidence that she was not, that her own evidence didn't support the conclusion that she was partially disabled. And the doctors addressed the question, and they found also that she could do all of her duties on a full-time basis. And if you could do everything on a full-time basis, that means you're not partially disabled. Okay. All right. Thank you, Your Honor. Okay. Thank you. Good morning. May it please the Court. I'm Scott Elk, and I represent Ms. Morrison. I've been representing her now for nine years. This case has been reviewed by the insurer no less than six times. It's had three different remands from the district court, and they could never get it right until the final remand when she was found. Not only was she disabled from her own work, but all work, because they finally did a physical examination on Ms. Morrison. The district court did not so find. The district court did not find that she was disabled. Where in the record is your best evidence, Mr. Elkind, that she has shown disability at all during the coverage period? Oh, absolutely, Your Honor. If you take a look at the dates I've set forth, I set forth each and every finding. And you will see the CT scans are especially important, that they repeatedly confirm the same conditions, splenomegaly, cavernous transformation, numerous varices, the treating oncologist, Anthony Felice, the same diagnoses with the panocyte, the PNES, splenomegaly, and the factor V Lyme mutation, which causes the blood clots. Now, just as an explanatory note, Ms. Morrison doesn't have an ordinary disability. She has portal vein hypertension, which means hypertension of the liver. She had a shunt put in, and she has a clotting disorder. So clots enter the shut and shut it down. And if it's not removed very quickly, she dies. Ten percent of the people who have this condition die every year. On top of that, she had renal cell carcinoma at first. She survived it. People with both conditions, 25 percent of them die. Over the course of a 10-year period, people with just portal vein hypertension, up to 60 percent, die. This is a very serious condition. Okay, but you can keep going. But what I hear you saying is that, as Judge Pillard said, the district court expressly said she was not making a decision that Morrison was totally disabled. So you're asking us to look at this to know, right? Yes, Your Honor. Do you agree we cannot affirm the decision as written? No, you can't. How? Okay, under the policy, you get benefits if you're totally disabled, right? Correct. But the district court expressly said she wasn't finding that your client was totally disabled. Correct, but that's not the correct standard of review, though. What's not the correct standard of review? The standard of review was established under Feiner, Stone v. Brook. I'll just take you from how this began. That means if you have de novo review unless you're afforded discretion. In this case, the plan was afforded discretion. So the district court is reviewing it for abuse of discretion, right? Then you go to the Hamilton and Fitz cases, which state that if the review is unreasonable, then it cannot be supported, and therefore, the claimant wins. That's how the district court wrote this decision. But it seems backward. I mean, I think there's something to Mr. Bacharach's point that typically when you look at what an entity entitled to discretion has done and you say, is it reasonable, you're looking for a basis for what they've done. So the district judge is looking for a basis, and she says, well, they're saying she's non-disabled. I don't see a basis for that. But against the backdrop of it being the claimant's burden to show, then the basis is the absence of evidence of disability. That's the basis. And there's nothing unreasonable about the insurer making that determination. So the basis is what they characterize as a zero. And what I want to hear from you is which pages should I look at in your record to identify a doctor telling me that your client is disabled in some way? Oh, absolutely. Which page numbers? Oh, absolutely. I'm about to read them to you. There was a question again to her main treating doctors, Dr. Karim Elmag and Dr. Guillermo Costa. They're both transplant surgeons. And you will see it's JA3395-410. Dr. Elmag states that throughout the course of his treatment, it gives a series of findings stating why she's disabled. Again, Dr. Guillermo Costa did another similar assessment. That's JA4523-30. And he did a second assessment, that's 4531-2, stating the same findings. And it's a series of findings of why she's unable to walk, why she has very extreme fatigue. Are those references to the revised appendix? Maybe not, Your Honor. I took it off my computer. It may not be. Sorry. It will be under the my computer. I have to express the court's displeasure at the handling of the appendix. It has been an extreme chore, Your Honor. Unfortunately, the appendix itself, we had to supply the appendix at first. We had to supply brand new evidence that was not conserved by the insurer. And then we had problems, too. It was scanned multiple times. And with this new scanning technology, it becomes unreadable at some point. And we were unaware that it had become unreadable by the time it got to the court. So for Dr. Kareem El Magh, the questionnaire is at 388-403. For Dr. Costa, it's 590-597. And then 598-599. And you are in volume? This is the revised. Volume? I don't have the volume, Your Honor. I just have the page numbers. And then Dr. El Magh reviewed Dr. Costa's findings where they actually, where Dr. Costa signed the date of 8-20-07 when Ms. Marson stopped working. And that's JA-600 and expresses concurrence at that time also. So not only did they make the series of findings all showing disability, they say it extends to the point on the day she stopped working. So we have the evidence, Your Honor. Whereas Reliance has used reviewers, Dr. Dean and Dr. Shipko, I produced massive evidence showing that they are pawns of the insurance industry. That's how they make their money, by doing reviews. They're not practicing doctors. And they have been getting enormous amounts of compensation for this. And that's what makes it arbitrary and capricious. Dr. Dean, as the court pointed out, ignored most of the evidence. Then they did a vocational review, relying only on Dr. Dean's opinion. Also, as the court pointed out, they ignored all these doctors' findings. They had a functional capacity evaluation. Her doctors confirmed that those findings were existent at the time she stopped working. And Ms. Marson is not an ordinary person. She left a job where she was about to get her master's paid for. She had a grant. She was a rapidly rising star in her job. Her co-workers bent over backwards to try to assist her to keep her job. And if you take a look at her work history, you will see that she worked until she dropped. She, at the end, she was barely able to work at all. And that evidence also was not reviewed and not mentioned by Dr. Dean. Dr. Dean did the most minimal of reviews. It was held to be unreasonable. The vocational report was unreasonable. And therefore, their conclusion was unreasonable. That means Ms. Marson wins. Because that is the law. If it is unreasonable, she gets her benefits. What case is it? That is, those are the Hamilton and Fitz cases from this district court in this circuit. If it is unreasonable, the insurer loses. You have to understand that under this process, the insurer gets discretion. That means the insurer has all the advantages. The claimant has an uphill path to win. The date on, I believe, on this document that you have pointed to as the primary, the 388-403, is May... May 7, 2013, Your Honor. Is that the first point? Well, I see May 18. Yes, Your Honor. 2010. That may very well be. These are the doctors that treated her the entire time. They know her entire medical history. Right, but there's a timeliness issue. Nobody is disputing that she's disabled now. Isn't that correct? The question is whether she was disabled during the relevant period, which closed... Which closed on March 1, 2008, Your Honor. So a report that shows her disability as of May 18, 2010 doesn't establish her disability... It refers to her entire course of treatment. ...doesn't establish her disability within the period, does it? No, yes it does, Your Honor. How so? It's a retrospective analysis, Your Honor. Not by some terms. This person treated her from the day one to that day. But what in the report says she was disabled during that period? Does anybody understand that? Yeah, Dr. Costa states here... What's it say? The concurrence with the FCE dated 10-2408, noting both continuing concurrence with findings in the presence of the same restrictions from... Which page are you on? This is... I don't have the page number. It comes from the JA4531-2. We can't use the old... I'm sorry, I gave you the old one. I'm reading from two pages. This would be... Dr. Costa, it's the second one. JA598-599, Your Honor, is where this comes from. So what's it say? It states that... It says she was disabled during the period. Yes, she was disabled from 8-2-0-7 forward, and that she had the same restrictions from the functional capacity evaluation that was dated 10-2-4-0-8, and they were existing at 8-2-0-7 as well. Now, Dr. Costa and Dr. Elmont then expressed this concurrence with that finding, and that is on 600. That all her doctors should treat her from day one to current state that she was disabled as of day one. There's no one else to contradict that. The only thing you have is a medical reviewer who did the review far after her period. So you have a medical reviewer who has not examined her, is paid by the insurance industry, did not review all the medical findings as noted by the district court, mischaracterized items, he did not review her work history, and therefore came back with determination, oh, she can work and here are her restrictions, like it's magic. Can you explain to me on JA600, there's a handwritten note under additional comments, patient should be re-evaluated for functional capacity. Current report to assess her current status is date 10-0-8, or patient should be re-evaluated for functional capacity to assess her current status. Current report is date 10-0-8. Can you explain what you understand that to mean? Yes, she wanted to have a new functional capacity evaluation done and it was done on June 2, 2011. That's JA565 to 571. We did follow that protocol and we did get another functional capacity evaluation and found her at pretty much the same levels. That's all past the period that's relevant. So when it says current report is date 10-0-8, what's that referring to? Because this document is dated June 11, 2013. Functional capacity evaluation, that was the original one. That report is at 559-565, is what the doctor is referring to. And he said she could just use a new one at the time and a new one was done, just to show her current abilities. Because not only did she have to prove she was able to do her own occupation afterwards, you're required to prove you can't do any occupation, which the insurer has found. But there's been no change in her condition. If you look at all the symptoms and all the findings, they are identical. Nothing's happened to her in between that's any different. The reliance has shown that she is disabled. If they had done the examination initially, she would have been found disabled. They have gone to reviewers who did not evaluate her. In fact, that a psychologist that did evaluate her, it's a violation of the psychological ethics not to personally examine someone before you render an opinion. We provided those ethical rules. He outright violated them and says he does it all the time. He doesn't even have an office. He doesn't have a secretary. He just takes cases from all these insurance companies. Same with Dr. Dean, who is a medical director with Unum, the largest disability insurer in the country. These men feed on these cases for their living. They are not credible. And her own doctors who are transplant surgeons. We're not talking a primary, Your Honor. We're talking hematologists, oncologists, and transplant surgeons. These are top doctors in the country. They do not see her very often. They see her when they need to save her life usually. That's about it. She is living day to day. She is a very sick lady. She has survived all the odds. And she's lucky to do that in itself. And she's just surviving, hoping someday she will finally get paid her disability benefits. And under the law, it was found that Reliance was unreasonable. That is the law. If they are unreasonable, under the deferential standard review, Ms. Marson wins. If the court did come out and say, well, she's disabled or not, there's the only part in the policy that says, if she is found disabled, and it's very important for this court to understand, it says only if the evidence is satisfactory to us is how it reads in the plan. Why is that important? Because that clause has been found to be arbitrary and capricious in every court. What is satisfactory to you, Your Honor, for me to take you, open up your wallet, and give this woman now hundreds of thousands of dollars that you owe her? There is nothing that is satisfactory to Reliance standard. And as counsel pointed out in his reply, he showed all the circuit court opinions. This is a scorched earth insurance company. They litigate everything to the help. They do not let the paid claims. And this is exactly what proves Ms. Marson's case. They looked with an eye which was jaundiced. She didn't have a chance from the outset, and this is just a huge path of denial. Now, this case has been going on now for nine years. Ms. Marson has suffered the entire time. And it just shows that Reliance has a very high tolerance for her pain. Can you, just to help us out in terms of what you're relying on, you've mentioned 388 to 403. You've mentioned 598 to 599. You've mentioned the 559 to 564. Is there anything else that you want to make sure? 598 to 599? Yep. Okay. And if you go to the functional capacity evaluations that were referred to? It's within the employment period, I think, is the 559 to 64, and we'll hear from Mr. Rosenblatt about that as well. I mean, Mr. Bacharach about that as well. Thank you. So does Mr. Bacharach have any more time? Okay. You can take two more minutes. Thank you. I appreciate that, Your Honor. I'm not going to address the remarks by counsel against my client. They're absurd. He's trying to argue hyperbole. Well, if you're not going to address them, why don't you not address them? That's a good point, Your Honor, especially with two minutes. Your Honor, you asked Judge Flaherty, you asked him to identify the evidence, and he cited two FCEs, one in October 2008. That's several months after her eligibility ended on March 1, 2008. The second one was in 2011. That's years after she stopped working, so her coverage had ended. What else did counsel say? He said that CT scans confirm that she's unable to work. No, they confirm a diagnosis. But she worked with this portal hypertension for years, so that's not a diagnosis. It doesn't mean a disability. There are other facts. Well, what's your response to counsel's argument that, look, the question here is whether your client reasonably or unreasonably denied benefits. That's the only question. The district court said it was unreasonable. The district court said it was unreasonable because the only decision that Reliance made was that she was capable of full-time work, and the court said that decision is not reasonably supported. But as I pointed out earlier, Your Honor, Reliance also said that she failed to meet her burden. So your point is, is counsel correct? This language in the district court order that I'm not making a judgment about whether she's disabled or not is really irrelevant. The only question is whether the insurance company reasonably denied the benefits, and that's the issue we're reviewing. Is that right? I disagree. Under the ERISA statute. Well, that's what I just asked. Yeah, under the ERISA statute. You're only allowed to award benefits due under the terms of the plan. Now, under the deferential standard, that means that she has to prove it's arbitrary and capricious. But if you're now saying that she can get awarded benefits even if she hasn't proven her claim, you're putting a higher burden on us when we're supposed to have a deferential review. So clearly that's not the law. The law is, even in anonymous cases I've pointed out. If the district court is supposed to review it deferentially, and I agree that's right, doesn't that mean that the district court looks at the evidence and makes a judgment as to whether the insurance company's decision was reasonable or not, right? If it's not reasonable, isn't that deferential? Well, the decision, it should be reviewed deferentially. Right. But the decision that this court made was not that it was reasonable to deny benefits, although the district court did say it would be reasonable to reach that conclusion that she did not prove her claim. But the district court in this case only said that it was unreasonable for Reliance to conclude that she was capable of full-time work at the time she stopped working based on its flipping of the burden of proof in this case. In the report dated October 08, the doctor says she began developing severe fatigue and other illnesses, began missing several work days, which worsened in January 2008. In February 2008, she was given an off-duty release by Dr. Elmage because of her chronic illness and fatigue. That's within the time period, is it not? Yeah, but that's incorrect. Those statements are incorrect. Dr. Elmage did not take her in his own words. I took her off work on March 20. You did what? Took her off work on March 20, 2008. That's when the doctor took her off work. There was an exam, interestingly, 10 days after she stopped working. And the question is, why wouldn't she see a doctor sooner if she suddenly became disabled? But the point is, even then the doctor didn't say she's disabled. And the district court, in its findings, even said that the first time around, said, you know, that there was no doctor that said that she should stop working or needed to stop working at this time. And, Your Honor, I know my time is up. Yeah, it's definitely up. Yeah, I appreciate that. If I may just make one final point. Yeah, one final point. That I really would urge the court to look strongly at the records that were just referenced by counsel because they do not support the number of the statements that were made. Most, if not all of them, are dated long after her coverage ended. And we think that what needs to get done here is the district court decision was clearly wrong, and we ask the court to... Let me just ask you one more question, which is, I think the typical experience is someone's being treated for a condition, and the doctors are focusing on the treatment and the person's condition as a diagnostic and therapeutic matter. And the individual, if she has a strong work ethic, is focusing on doing work that she can do and resting to recover to the extent that she can. And when employment ends, it might be reasonable to focus more on documenting support for benefits. Is there no basis in this record for an implication that an illness that she had that required surgery within the coverage period was nonetheless not manifest until the work-related medical documentation was finalized after the coverage period? If her doctors didn't say in November 2007... Remember, she stopped working August 2007. If her doctors didn't say in November 2007 that she could return to work, and that's a finding the district court made, maybe we have a different case here. But her own doctors said she could return to work. And after that time, all that she complained about in November and December was mild fatigue. And then 10 days after she stopped working, she says that her condition improved. So when you look at all of that and you look at the lack of treatment, the FC didn't take place until nearly a year later. The records don't support it. And, by the way, Your Honor is familiar with the Black & Decker v. Nord case out of the Supreme Court. I don't think her doctor said she was disabled during the relevant time. They rely on these. There may be one or two reports way after the fact that try to relate things back, but I really don't think most of them are based on the FCE. But the fact is even if her doctors say that she was disabled from August all the way forward from doing anything, my client is not obligated to follow that under Supreme Court precedent in Nord. Okay. Thank you. Thank you, Your Honors.
judges: Tatel, Pillard, Wilkins